# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs July 1, 2016

## IN RE STORMIE M., ET AL.

### Appeal from the Juvenile Court for Macon County
#### No. 2015JV64      Ken Witcher, Judge

———————————————————————

### No. M2015-02336-COA-R3-PT – Filed September 15, 2016

———————————————————————

This appeal involves the termination of parental rights with respect to three minor children. The trial court terminated Mother's parental rights on the grounds of abandonment, substantial noncompliance with the permanency plans, persistent conditions, and severe child abuse. The trial court also terminated the parental rights of the putative father of one of the minor children. On appeal, we conclude that considerations of fundamental due process require us to vacate that portion of the trial court's final decree terminating the putative father's parental rights. Concerning Mother's parental rights, we reverse the trial court's determination that Mother abandoned the children by willfully failing to support them in the four months preceding the filing of the termination petition. We also reverse the trial court's finding that clear and convincing evidence established the ground of persistent conditions. However, because clear and evidencing evidence supports at least one ground for termination and that termination is in the children's best interests, we ultimately affirm the termination of Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated in Part, Reversed in Part, Affirmed in Part, and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

Jaimee H. Underwood, Gordonsville, Tennessee, for the appellant, Sherry K.

Herbert H. Slatery, III, Attorney General and Reporter, Rachel E. Buckley, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

# OPINION

# BACKGROUND

Sherry K. ("Mother") is the biological mother of Stormie M., Madison R., and Leonidas M.[1] On February 24, 2014, the Tennessee Department of Children's Services ("the Department") received a referral with allegations of lack of supervision as to all three children. When a Department case manager met with Mother about the referral, Mother reported that she suffered from anxiety and depression. She also revealed that she had a lot of trouble with Madison's behavior at home. Among other things, she reported that Madison often ate out of the trash and that she had eaten dry wall off the walls at the family's previous home. Mother agreed to receive parenting services during her February 24 visit with the Department, and parenting services were subsequently made available to her later that spring.

On May 9, 2014, the Department filed a petition in the Macon County Juvenile Court to declare the children dependent and neglected. The Department alleged that it had received a phone call that Madison, who was two years of age at the time, was found in the middle of the road by a FedEx driver. According to the Department, Mother had stated that she left Stormie, then age four, to supervise Madison while the two children played outside. Finding there to be probable cause that the children were dependent and neglected based on the allegations in the Department's petition, the juvenile court subsequently entered a protective custody order placing the children in the Department's custody.[2]

Following the children's removal, on June 4, 2014, a family permanency plan was created. The permanency plan focused on improving Mother's ability to supervise the children; it also sought to ensure that the children's financial and emotional needs were met. Among other things, the permanency plan required Mother to complete a mental health assessment and follow all treatment recommendations, submit to random drug tests and pill counts, provide proof of income, demonstrate the ability to be financially self-sufficient, obtain and maintain housing, and pay child support. This permanency plan was later ratified on November 6, 2014. On February 3, 2015, a permanency plan containing similar requirements was created.

---

[1] In cases involving minor children, it is this Court's policy to redact names sufficient to protect the children's identities.

[2] The protective custody order was entered on May 9, 2014, the same day that the Department's dependency and neglect petition was filed.

On October 7, 2014, the Department filed a motion to terminate Mother's supervised visits with the children amidst allegations that she had sexually abused Stormie and Madison. Later that same day, the juvenile court entered an order terminating Mother's visitation with the children pending a future hearing. A little over a week later, on October 16, 2014, the juvenile court entered an order upholding its decision to terminate Mother's visitation. The court's order noted that Mother had waived her right to a hearing due to her absence. Although some within the Department later suspected that the children had been coached with respect to the sexual abuse allegations related to Mother, Mother's visitation was never reinstated. We note that by the time of the eventual termination hearing, the concerns about coaching had apparently been allayed.[3]

On April 24, 2015, the juvenile court entered an order declaring the children dependent and neglected. As a part of its order, the juvenile court found that Madison was a victim of severe child abuse as defined by Tennessee Code Annotated section 37-1-102(b)(21). In pertinent part, the juvenile court found as follows:

> Mr. Anthony Clausi testified to [Madison's] mental health condition. Mr. Clausi provided an example of a study of Romanian orphans who were not properly nurtured. He compared those studied orphans to Madison and Stormie. He opined that Madison's behavior of eating drywall and eating out of trash cans was a direct result of neglect. Mr. Clausi opined that the [Mother's] neglect caused [Madison's] pervasive development disorder which caused a severe impairment in her ability to function adequately in her environment.

Mother never appealed the juvenile court's finding of severe abuse.

The same day that the juvenile court declared the children dependent and neglected, the Department filed its "Petition for Termination of Parental Rights." In the petition, the Department sought to terminate Mother's parental rights, as well as the parental rights of three men who were identified as putative fathers of the children. Concerning Mother, the petition alleged that several grounds for termination existed: abandonment by willful failure to support, abandonment by failure to establish a suitable home, substantial noncompliance with the permanency plan, persistent conditions, and severe child abuse. The petition also averred that termination of Mother's parental rights was in the children's best interests.

---

[3] Indeed, the case worker assigned to work with Mother testified at the termination hearing that the Department's initial concerns about coaching were the result of misinterpreting the foster mother's efforts at directing the children to be honest and open with the authorities.

A hearing on the Department's termination petition was held on November 2, 2015. The first witness to testify was Mary Oakley ("Ms. Oakley"). Ms. Oakley testified that she was formerly employed by Health Connect and had provided parenting education to Mother from April 2014 to August 2014. During that timeframe, some of which took place prior to the children's removal, Ms. Oakley provided approximately twenty-five hours of parenting instruction. According to Ms. Oakley, her discussions with Mother focused on "what is appropriate, what is not appropriate, and the responsibilities of children at certain ages." Ms. Oakley stated that she had stressed the importance of creating a home environment that is supportive to the children. When asked about Mother's willingness to implement the parenting education she had provided, Ms. Oakley stated that she "never really saw any consistency" from Mother. For example, although one of the children had previously eaten out of the trash can, Ms. Oakley observed that trash was still "piled up" at Mother's residence. Given the child's inclination to eat from the trash, Ms. Oakley opined that it was important for Mother to remove it. Ms. Oakley expressed concern that Mother did not appear to be motivated to make changes, even after her children had been removed. Ms. Oakley also expressed concern over the incident that precipitated the children's removal in May 2014. Indeed, when testifying about how one of the children had been found unsupervised in the middle of the road, Ms. Oakley stated as follows:

> It was very concerning. Like I said . . . I had started a month prior to that providing services in the home and we had talked a lot about age-appropriate behaviors and how to parent a child that shows behaviors and that it should be -- that she should supervise the child at all times, and then, you know, she had the front door the little girl could unlock. Stormie could unlock and Madison could unlock as well and just exit the home at any time. So we talked about safety concerns and things like that.
>
> So it was, like I said, as a worker in the home, it was a very disheartening situation to realize that it had almost digressed that what we had talked about and to this situation to happen.

Following Ms. Oakley's testimony, the Department called Sheila Hensley ("Ms. Hensley") as a witness. Ms. Hensley testified that she had worked with the minor children's foster family in this case as a counselor and case manager. She stated that the foster family was a two-parent household and that it had two other children in the home in addition to the minor children at issue. She asserted that the foster parents met the minor children's needs and often went "above and beyond" the efforts of a typical foster family. Ms. Hensley opined that the children would regress if they were taken away from their foster family, and she stated that she would support the foster family adopting the children should the children be made available for adoption. She testified that the minor children had a structured

schedule with their foster parents, and she was of the opinion that the minor children enjoyed living with them. When asked specifically how she could tell that the minor children enjoyed living with their foster family, Ms. Hensley stated as follows: "They're always excited and talking. They have all these toys, and they tell me about all these things they do. And they're always smiling when I see them. They're always smiling." Although Ms. Hensley acknowledged that a previous case manager had suspected that the foster parents were coaching the children, she stated that she did not believe coaching was an issue.

Next to testify was Mother. Mother generally testified about her mental health status, her employment status, and the requirements imposed on her under the permanency plans. Concerning her mental health, Mother did not deny that she needed regular help and treatment. The records introduced at trial revealed that Mother had received several diagnoses regarding her mental health over the years, including mood disorder, bipolar disorder, general anxiety disorder, PTSD, OCD, and major depressive disorder. Despite her admission that she needed help, Mother's testimony revealed that she had not been consistent in attending counseling. When asked why she had not done a good job of completing the needed treatment in the months following the children's removal, Mother placed blame at the feet of her former mental health provider. Her specific testimony on this issue was as follows:

> In my defense, may I state this? I was going through mental health co-op. They would put me on the schedule. I would get all the way up there and they would be like, well, we don't see you on the schedule, and they would send me back home several times. That's why I finally switched to Valley Ridge. And since I've been with Valley Ridge, I've only missed a couple of appointments due to sickness and that's it.

When presented with a record from the mental health co-op stating that Mother had been noncompliant in taking her medications, Mother stated that the record was not accurate. Mother also attacked the accuracy of her mental health records in other respects. For example, when presented with a progress note from October 2014 that indicated that Mother was having suicidal ideations, Mother denied that this was correct. Moreover, she testified that the records from the health co-op failed to indicate the "few times" that she alleged to have attended therapy there. Mother also expressed surprise as to why her health records indicated that she had only started counseling sessions in the months leading up to trial. When asked about this fact, Mother responded as follows: "No, I've been doing it longer than that. It's just I'm not understanding these files, and I'm not understanding why certain stuff's not in there that should be in there." The records that were introduced at trial indicated that Mother had attended only seven counseling sessions in 2015. Although

Mother asserted that her mental health issues were under control, she acknowledged that she would require regular ongoing treatment.

Concerning her employment prospects, Mother testified that she had a certified nursing assistant's license but had not worked in a medical setting in several years. Although she testified that she was fired from her last job after she had a seizure while at work,[4] she stated that she was physically able to work as long as someone was willing to work with her seizure conditions. However, she also noted that she was pursuing disability benefits with the Social Security Administration. Mother admitted that as of the date of trial there had been no determination that she was disabled.

Although Mother stated that she had not always paid the full amount of child support required of her, she claimed to pay "whatever spare money [she could] get ahold of." Moreover, although she also claimed to have purchased clothing and toys for the children, she stated that she had been unable to give those items to them.[5] According to her testimony, she frequently encountered difficulty in contacting Amy Shores ("Ms. Shores"), a Department case worker who had been assigned to work with Mother. Specifically, her testimony on this issue was as follows:

> I would like to say, I didn't mention earlier whenever she was saying it was my responsibility to contact Amy, whenever I would call her, she never answered her phone. I would leave her a voicemail to call me back and she never did. And the only way I ever really got through to her answering is I would call from a stray number and she would pick up.

Concerning the permanency plan's requirement that she submit to pill counts, Mother testified that she had never been requested to do one. However, she stressed that she had been willing to do them. When asked about the permanency plan requirement that she provide proof of income, Mother seemed to suggest that concrete proof by way of a W-2 form or pay stub had been unavailable to her because she had previously worked for an individual, as opposed to a public company. Mother testified that she had typically been paid in cash, although she stated that she had sometimes received a personal check. When asked

---

[4] Mother asserted that the individual for whom she had been working found Mother's seizure to be "unprofessional." Per the testimony of Amy Shores, a case worker with the Department, Mother had indicated that she was "caring for the elderly" in this previous job.

[5] We note that the children's foster mother testified that Mother had provided the children diapers and wipes at the beginning of their time in foster care, in addition to providing some outfits and toys at Christmas. However, the foster mother stated that Mother had not provided the children with anything since that time.

if the individual who employed her could have written a letter discussing her income, Mother testified that she had obtained such a letter on one occasion and shown it to Ms. Shores.

Mother also testified about her living situation. At the time of the children's removal, she had lived with her mother. Mother admitted that her mother's home had not been a good place for the children to be, and she noted that her brothers had frequently turned off door sensors that were meant to protect the children. In explaining why her brothers had done this, she stated that her brothers "didn't like the high pitched noise [that emitted] whenever . . . they would open the door." Mother claimed that she had been motivated to move from her mother's home and testified that she had been living in a new apartment since November 2014. Although Mother indicated that Ms. Shores had apparently come to her apartment on a couple of occasions when only Doug M., her longtime boyfriend, was there,[6] she stated that the Department had not conducted any home studies of her new residence as of the date of trial. During her testimony, Mother revealed that she and Doug had previously been involved in a domestic violence incident.

Although Mother acknowledged that she had made some mistakes in the past, she stated that she had learned from them. She asserted that her counseling sessions had taught her the importance of disciplining and supervising children, and she testified that she would be a better parent moving forward. In explaining how she had changed, Mother stated specifically as follows: "I know right from wrong now. I know how to be a productive parent and how to, you know, interact with them more on their level and not use words that are too big for them to understand."

The children's foster mother, Amanda B. ("Foster Mother"), testified that she had cared for the children since May 2014. In addition to caring for the three children at issue, Foster Mother testified that she had two biological sons who were a part of the family. According to Foster Mother, the minor children and her biological sons interacted well together. She claimed that they played together every day and were emotionally accepted as part of a single unit. Foster Mother testified that the minor children referred to her and her husband as "[m]omma and daddy," and she asserted that she and her husband were committed to adopting the minor children should they be available for adoption. In this vein, she indicated that she was willing to provide the necessary medical care and counseling that the children might require.

---

[6] Doug M. was named as a Respondent in the termination petition and was listed as the putative father of two of the minor children at issue. According to the record transmitted to us on appeal, his parental rights have yet to be terminated.

The last witness to provide live testimony was Ms. Shores. As previously noted, Ms. Shores worked with Mother in this case on behalf of the Department. According to her testimony, Ms. Shores had been assigned to Mother's case since the children's removal in May 2014. She testified that she developed both permanency plans created in this case and stated that both plans had been designed to correct the reasons that led the children to be placed in foster care. According to Ms. Shores, Mother had informed her that she had a job "caring for the elderly" in the months preceding the filing of the termination petition. Ms. Shores recalled that on one occasion Mother had even provided her "a statement from the person that she was supposed to have been working for." However, Ms. Shores testified that Mother had generally failed to stay in contact with her and stated that this had hindered her ability to provide services to Mother. When asked to specifically identify what communication barriers existed between her and Mother, Ms. Shores stated as follows:

> Change of phone numbers. Sometimes they would have minutes and sometimes they would not. And I know that there had been times I contacted both the attorneys to see if they had any new numbers or different things, but I think the change in phone numbers and probably the lack of having a phone at certain times was the biggest barrier.

Ms. Shores testified that her own phone number had not changed in the past year, and she estimated that Mother had only called her "a handful of times" in the six months preceding the trial.

Ms. Shores testified that Mother's biggest barrier to regaining custody was her failure to receive mental health treatment. In this regard, she noted that Mother had not started counseling until June 2015. Ms. Shores claimed that she frequently reminded Mother to seek out counseling whenever she was able to communicate with her. Although Mother apparently claimed that she was consistently attending counseling, medication management, and case management sessions, Ms. Shores stated that Mother's mental health records only showed consistent attendance with respect to the latter two areas of treatment. She opined that Mother's failure to comply with her mental health treatment indicated that Mother had not done what was necessary to facilitate a safe return of the children to her. Moreover, she stated that the children would regress if removed from their foster home. Although Ms. Shores testified that she actively worked with Mother early on by providing transportation for Mother's appointments, her testimony revealed that she backed off in providing transportation directly after discussing Mother's progress with the children's therapist, Mr. Anthony Clausi:

- 8 -

One of the things that [Mr. Clausi] asked for the parents to be able to show him, that they were motivated and could do things on their own. Because for one, we would hope that DCS case managers wouldn't be in their life forever. So he would give them, you know, things to do such as contact TennCare transportation . . . because you want them to be able to be successful on their own and not me being there all the time or someone with DCS.

In contrast to Mother's testimony, Ms. Shores stated that she had conducted several home visits to the apartment where Mother and her boyfriend, Doug M., lived. Although she admitted that she had been to the home at least once when only Mother's boyfriend was present, she also stated that she had been to the apartment when both Mother and her boyfriend were there. She claimed that no one had answered the door on other occasions when she had scheduled appointments at the home. Ms. Shores indicated that her ability to visit Mother had been hindered, in part, due to the fact that Mother had made threats against her. Whereas Mother had described her threats against Ms. Shores as mere "venting," Mother's apparent hostility was so concerning that the attorneys on both sides of the case had discussed the need to accompany Ms. Shores on visits to the home. According to Ms. Shores, however, she and the attorneys were never able to follow through with this plan.

Although she acknowledged that the Department had previously been concerned that Foster Mother was coaching the minor children, Ms. Shores testified that she was no longer concerned about this issue. She claimed that Foster Mother's actions had likely been misinterpreted:

[W]hen the kids go to foster mom, normally, and make[] statements, she urges them to be open and honest with the Department and anybody who asks questions. So if you ask the kids, was you told to tell, and they would say, yes. Because of the [foster parents'] urging them to be open and honest with us.

In addition to the live testimony that was presented, the Department introduced two depositions into evidence. The first deposition that was introduced was the deposition of Jeffrey Scott Herman ("Mr. Herman"), a senior psychological examiner and licensed professional counselor. According to Mr. Herman, the role of psychological examiner is to conduct psychological tests "for the purpose of diagnosis and treatment." Mr. Herman testified that he performed a psychological and parenting assessment of Mother on October 2, 2014. Although Mother had presented to Mr. Herman saying she had a previous diagnosis of borderline personality disorder, Mr. Herman was not able to make this determination. However, he was also unable to dismiss the possibility that Mother suffered from that condition. He stated that "[b]orderline personality disorder is very tricky to diagnose and often requires multiple observations." In his report, which was attached as an exhibit to his

deposition, Mr. Herman stated that whether Mother had borderline personality disorder would be "best considered within the context of the therapeutic relationship."

Mr. Herman testified that there was often a relationship between poor parenting and a diagnosis of borderline personality disorder. Although he acknowledged that he had worked with people who had successfully parented despite having the disorder, he noted that this was true "so long as they remained in treatment." Mr. Herman noted that the treatment of choice for borderline personality disorder was "dialectical behavior therapy," which he indicated took a lot of commitment. He noted that the therapy involved "one-on-one psychotherapy" and was usually supplemented with group psychotherapy.

In addition to Mr. Herman's deposition, the Department introduced the deposition of Anthony John Clausi ("Mr. Clausi"), a therapist at Vanderbilt Community Mental Health Center. Mr. Clausi testified that he had treated two of the children at issue in this case. Although he had previously identified Madison as having a pervasive development disorder, he stated that he had since seen improvement in her. Mr. Clausi attributed this improvement to the Foster Mother's efforts in providing structure and discipline for the children. Nonetheless, he still opined that Mother's neglect of Madison had caused a severe impairment in her ability to function adequately in her environment.

Mr. Clausi testified that Mother had exercised visitation/parenting time in some of the children's therapy sessions. Although he stated that Mother did an "adequate" job of parenting with only one child in the room, he testified that Mother seemed overwhelmed when all three of the children were present. Moreover, while Mr. Clausi testified that he did not think that Mother was a bad person, he described her as "inept" and lacking the skills necessary to parent.

Several weeks after the conclusion of the termination hearing, on November 23, 2015, the juvenile court entered an order terminating Mother's parental rights on all of the grounds that the Department had asserted in its petition. The November 23 order also terminated the parental rights of one of the identified putative fathers, Respondent Semaj L. Although the rights of two of the other fathers who were named in the termination petition were not finally decided by the November 23 order, the trial court certified its judgment as final pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure, finding that there was no just reason for delay. Mother then filed this timely appeal.

## STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the

federal and state constitutions." *In re M.L.P.*, 228 S.W.3d 139, 142 (Tenn. Ct. App. 2007) (citations omitted). "Although this right is fundamental and superior to claims of other persons and the government, it is not absolute." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007) (citation omitted). "It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted). In Tennessee, "[w]ell-defined circumstances exist under which a parent's rights may be terminated." *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015), *no perm. app. filed*. Pursuant to the Tennessee Code, parties who have standing to seek the termination of a parent's parental rights must prove two things. First, they must prove at least one of the statutory grounds for termination. *In re J.C.D.*, 254 S.W.3d at 438 (citing Tenn. Code Ann. § 36-1-113(c)(1)). Second, they must prove that termination of parental rights is in the child's best interests. *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)).

Because the decision to terminate a parent's parental rights has "profound consequences," trial courts must apply a higher standard of proof in deciding termination cases. *In re M.L.P.*, 228 S.W.3d at 143. "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007) (citation omitted). This heightened burden of proof "minimizes the risk of erroneous decisions." *In re M.L.P.*, 228 S.W.3d at 143 (citations omitted).

Due to the heightened burden of proof required under the statute, we must adapt our customary standard of review. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). "First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d)." *In re M.J.B.*, 140 S.W.3d at 654. "Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *Id.* (citations omitted).

Although in this case Mother has failed to challenge every ground for termination found in the trial court's November 23, 2015 decree, such failure does not curb our review on appeal. In order to "ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures," we are required to review the trial court's findings as to each ground for termination and as to whether

- 11 -

termination is in the child's best interest. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal."), *petition for cert. filed sub. nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, No. 15-1317 (U.S. Apr. 22, 2016). Accordingly, our discussion will not be restricted to the specific issues delineated in Mother's brief.[7]

## DISCUSSION

Pursuant to its November 23, 2015 decree, which was certified as a final judgment pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure, the trial court terminated the parental rights of Mother and Respondent Semaj L. ("Putative Father"). Although only Mother has appealed from this judgment, considerations of fundamental fairness require that we first address the manner in which Putative Father's parental rights were terminated by the trial court. *See in re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *4-8 (Tenn. Ct. App. June 3, 2003) (vacating a termination order as to certain respondents when the record evidenced that the method selected to provide notice was not reasonably designed to provide notice). When necessary to prevent injury to the interests of the public or prejudice to the judicial process, we have the discretion to consider issues other than those specifically presented for our review. *See* Tenn. R. App. P. 13(b).

### *Termination of Putative Father's parental rights*

In this case, the trial court's November 23 decree recites that Putative Father was served with a summons and a copy of the petition by publication. There is no question that service by publication is a permissible manner in which respondents can be given notice of a termination proceeding. With that said, "[n]otice by publication, without more, should be the alternative of last resort." *In re Z.J.S.*, 2003 WL 21266854, at *6 (citation omitted). "[B]ecause service of process is not 'a mere perfunctory act' but has 'constitutional dimensions,' a plaintiff who resorts to constructive service by publication must comply *meticulously* with the governing statutes." *Turner v. Turner*, 473 S.W.3d 257, 274 (Tenn. 2015) (quoting *In re Z.J.S.*, 2003 WL 21266854, at *6 (citing *In re Baby Girl B*, 618 A.2d 1, 17 (Conn. 1992))). In this case, the record raises serious questions as to whether reasonable steps were taken to ensure that Putative Father had actual notice of the termination proceeding. Moreover, the trial court's entry of the publication order was noticeably flawed.

---

[7] In addition to challenging some of the trial court's findings as to grounds for termination and the children's best interests, Mother's brief asserts that the trial court erred in finding that the Department provided reasonable efforts to Mother.

In the termination petition filed on April 24, 2015, the Department did not allege that Putative Father's whereabouts were unknown. Rather, it specifically identified an address for Putative Father that was located on "Peter Pan Street" in Madison, Tennessee. In an affidavit that was also filed on April 24, a Department case manager described the various efforts the Department had made to assist Putative Father and the other named Respondents. Concerning Putative Father specifically, the case manager identified several dates on which she had spoken to Putative Father and obtained his contact information. Although that affidavit states that returned mail was received from Putative Father on October 1, 2014, it does not specify the address from which this mail was returned. Moreover, we note that according to the trial court's findings of fact in its November 23 decree, the Department sent additional correspondence to Putative Father by mail on October 18, 2014. There is no indication that this mail was ever returned undelivered. Again, insofar as the Department indicated in its initial pleading, as of April 24, 2015, an identified address for Putative Father was known.

On May 13, 2015, the Department filed a motion to serve Putative Father by publication. The Department's motion stated that Putative Father's residence was unknown and could not be ascertained upon diligent inquiry. Although the motion recited that an affidavit was attached in support of its request for constructive service, no affidavit was actually attached to the motion. An affidavit of diligent search was, in fact, later filed the next day on May 14, 2015, but it did not accompany the motion itself.

On May 13, 2015, the same day that the Department filed its motion, the trial court entered an order allowing Putative Father to be served by publication. In pertinent part, the trial court's order stated as follows:

> It appearing to the Court from the allegations of the Petition for Termination of Parental Rights, Motion for Service by Publication *and the Affidavit of Diligent Search* that the whereabouts of the Respondent, [Putative Father] are unknown and cannot be ascertained by diligent search, therefore, the ordinary process of law cannot be served upon [Putative Father]. It is, therefore, ORDERED that said Respondent be served by publication . . . for four consecutive weeks in a newspaper published in Davidson County, Tennessee.

(emphasis added). Although the trial court's order purports to base its decision to allow publication, in part, on the basis of an affidavit of diligent search, the record indicates that no such affidavit was before the court at the time it entered its publication order. As previously noted, although the Department did file an affidavit of diligent search in this case, that

- 13 -

affidavit was not filed until May 14, 2015. Moreover, the notary public who witnessed the affidavit's attestation indicated that the testimony therein was sworn to on May 14, 2015.

In light of the facts discussed above and the record transmitted to us on appeal, it is clear that the order of publication was not based on any testimony chronicling the Department's efforts to locate Putative Father. The order of publication therefore lacked the requisite legal predicate necessary to allow constructive service of process. Under Tennessee Code Annotated section 36-1-117(m)(3), "[a]ny motion for an order for publication in [termination proceedings] shall be accompanied by an affidavit of the petitioners or their legal counsel attesting, in detail, to all efforts to determine the identity and whereabouts of the parties against whom substituted service is sought." Tenn. Code Ann. §36-1-117(m)(3).

In addition to the fact that the publication order was entered prior to any sworn testimony being presented to the trial court regarding Putative Father's whereabouts, the record raises substantial questions as to whether the Department exercised true due diligence in attempting to find and serve him. In the belated affidavit of diligent search that was filed, a Department case manager outlined the general efforts she had taken to find Putative Father. Whereas the Department's April 24, 2015 affidavit of reasonable efforts indicated that the Department had spoken to Putative Father on several occasions,[8] the Department's affidavit of diligent search recounts none of them. It notes that the Department previously sent letters to three addresses thought to belong to Putative Father and states that Putative Father was once located on "social media" but that no response was received from him when a case manager attempted to message him. The affidavit of diligent search also states that the Department attempted to determine whether Putative Father was incarcerated. The fact that the affidavit of diligent search does not discuss the previous occasions on which the Department had been in contact with Putative Father is somewhat suspect.

Moreover, we note that no mention is made of any effort to serve Putative Father at the Madison, Tennessee address that the Department had previously identified as an address for Putative Father in the termination petition. The concern that arises from this omission is only magnified in light of the subsequent finding that the trial court made in its November 23, 2015 termination decree. Notwithstanding its conclusion that Putative Father had been properly served by publication, the trial court specifically found in its termination decree that Putative Father had an address on "Peter Pan Street" in Madison, Tennessee. The address listed is the same address that the Department had listed for Putative Father in the termination

---

[8] The April 24 affidavit did not aver that Putative Father's whereabouts were unknown, and it was not filed in support of a request for constructive service on Putative Father. The April 24 affidavit was filed contemporaneously with the termination petition and attested generally to the Department's efforts to provide assistance to the named Respondents. As we have previously indicated, the termination petition affirmatively identified an address for Putative Father.

- 14 -

petition. Certainly, if Putative Father has an identifiable address as the trial court found, efforts must be made to serve him there.

As should be evident from the discussion above, the trial court's entry of a publication order was not flawed simply due to the fact that it was not based on any sworn testimony detailing the Departments' efforts to locate Putative Father. Assuming *arguendo* that the affidavit of diligent search had been considered by the trial court prior to the entry of the order of publication, substantial questions also exist generally as to whether proper efforts were made to locate and serve Putative Father. Again, we note the following: the Department initially represented that Putative Father lived at a specific address on "Peter Pan Street" in Madison, Tennessee; the Department never indicated that it attempted to serve Putative Father at this address; and the trial court later found that Putative Father lived at the address on "Peter Pan Street." Absent further clarification of these facts, it is unclear how constructive service is permissible under these circumstances. Service by publication should only be resorted to as a matter of last resort. If Putative Father is to be served by publication, the Department must comply "meticulously" with the governing statutes. *Turner*, 473 S.W.3d at 274 (citation omitted). Due process requires no less. For the foregoing reasons, we hereby vacate the portion of the trial court's November 23, 2015 decree terminating Putative Father's parental rights.

## *Termination of Mother's parental rights*

In its final decree, the trial court found that the following grounds existed for terminating Mother's parental rights: (1) abandonment by willful failure to support, (2) abandonment by failure to provide a suitable home, (3) substantial noncompliance with the provisions of the permanency plans, (4) persistent conditions, and (5) severe child abuse. Although we are required to review each ground for termination found by the trial court, *In re Carrington H.*, 483 S.W.3d at 525-26, we ultimately need only find that one ground for termination was established in order to uphold the trial court's decision. *In re Valentine*, 79 S.W.3d at 546. We will review each ground in turn.

*Abandonment*

The first ground for termination listed in our termination statute, and the most frequently relied on, is abandonment. *In re Audrey S.*, 182 S.W.3d at 862. The acts that constitute abandonment are outlined in Tennessee Code Annotated section 36-1-102, which provides five alternative definitions. In this case, the Department alleged that Mother had abandoned the children by failing to support them and by failing to provide a suitable home. These bases for termination, which comprise the first and second definitions of abandonment under section 36-1-102(1)(A), are defined respectively as follows:

(i)     For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that **the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support** or have willfully failed to make reasonable payments toward the support of the child;

(ii)    The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that **the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home** and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i)-(ii) (emphasis added).

The trial court concluded that both of the above bases for abandonment were properly established by the evidence introduced at trial. We turn first to the trial court's conclusion that Mother willfully failed to support the children in the four months preceding the commencement of the termination proceeding. Regarding this issue, the trial court found as follows:

19. [Mother] willfully failed to support [the] children for four (4) months immediately preceding the filing of this petition or the support paid in the four months immediately preceding the filing of this petition was token support.

- 16 -

[Mother] has not contributed to the support of the children since at least May 9, 2014. [Mother] is able bodied and capable of working and supporting the children. [Mother] was aware of her duty to support the children. [Mother] has made no attempt to support the children and has provided no justifiable excuse for failing to support the children.

For purposes of this subdivision of abandonment, "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the "willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is defined as "support, [that] under the circumstances of the individual case, is insignificant given the parent's means." *Id.* at (1)(B).

Because this definition of abandonment focuses on the four-month period immediately preceding the filing of the termination petition, the relevant period in this case began on December 24, 2014. Having reviewed the record transmitted to us on appeal, we note that there is evidence of Mother giving some support to the children during this period. According to Ms. Shores' testimony, Mother provided the children with some gifts and clothes at Christmas. Moreover, the record contains evidence that Mother made child support payments in January and April of 2015. Although Mother claims that her total payments were more than the amount shown on a printout from the child support office that was introduced into evidence, it is clear that she paid at least $200 in child support during this period.

Although the trial court stated in its oral ruling that Mother's support to the children could be classified as "token," we conclude that the Department failed to sufficiently prove that Mother's support between December 24, 2014 and April 24, 2015 reflected mere token support. As already noted, token support is support which, under the circumstances of the individual case, "is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). "In the context of token support, the word 'means' connotes both income and available resources for the payment of debt." *In re Adoption of Angela E.*, 402 S.W.3d 636, 641 (Tenn. 2013) (citations omitted). In this case, the evidence pertaining to Mother's means is quite limited. Although Ms. Shores testified that Mother was "caring for the elderly" in the period prior to the filing of the termination petition and Mother testified that she was physically able to work, it is not clear to us that the support provided by Mother was insignificant given her available resources. The record does not contain evidence of the amount of income Mother was making during the relevant four-month period, nor is a clear picture of her expenses presented. Although it is possible that Mother's overall support to the children was inadequate, the record does not paint a clear and convincing picture on this

point.  Because the evidence is insufficient to support a finding of abandonment by willful failure to support, we are compelled to reverse the trial court's finding on this issue.[9]

We next turn to the trial court's determination that Mother abandoned the children by failing to establish a suitable home.  In pertinent part, the trial court found as follows with respect to this issue:

24.  The children were removed from . . . [Mother] as the result of a Petition filed in Juvenile Court in which the children were found to be dependent and neglected as defined by Tenn. Code Ann. § 37-1-102(12) and the children were placed in the Department's custody.  The Juvenile Court found that the Department made reasonable efforts to prevent removal of the children or the circumstances of the children's situation prevented reasonable efforts from being made prior to the children's removal.

25.  For a period of four (4) months following the removal of the children from the parents, the Department has made reasonable efforts to assist . . . [Mother] to establish a suitable home for the children, but the parent has made no reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the children to such a degree that it appears unlikely that [Mother] will be able to provide a suitable home for the children at an early date.  That four month period of time following the removal is from May 9, 2014 to September 9, 2014.

26.  The reasonable efforts the Department made in the first four months include those articulated within the affidavit submitted by case manager Amy Shores.

27.  The parents' lack of reasonable efforts include: [Mother's] fail[ure] to stay in contact with the case manager.  [Mother] failed to obtain a job so that she could provide housing and food for her children.  [Mother] failed to establish housing separate from her abusive family members.  [Mother] failed to comply with mental health treatment so she would be a safe caregiver to her children.

---

[9] The availability of evidence on this issue was perhaps impacted by Mother's failure to stay in proper communication with the Department.  As will be discussed below, although the permanency plans required Mother to provide the Department with proof of her income, she never made any consistent efforts to do so. While Mother did provide the Department with a letter from her individual employer on one occasion, the Department never revealed the specific details of what this letter stated, nor was the letter ever introduced into evidence.

We agree with the trial court's determination that clear and convincing evidence establishes this definition of abandonment. The children were removed from Mother's custody on May 9, 2014 pursuant to the juvenile court's protective custody order. During the four months that followed this removal, the Department made a number of efforts at assisting Mother. An affidavit introduced at trial details these efforts, including the various conversations Ms. Shores had with Mother concerning her mental health progress and need for appropriate housing. Moreover, the affidavit shows that Ms. Shores supervised several visits with the children and provided transportation in order to allow Mother to attend. According to Ms. Shores, she consistently discussed Mother's need for counseling and appropriate housing on these occasions. The Department also facilitated the scheduling of Mother's psychological evaluation and offered assistance in completing the permanency plan requirements.

Despite the Department's outreach to Mother during this period, the trial court concluded that Mother failed to stay in proper contact with the Department. Mother did not seek out counseling, nor did she move from her mother's residence within the first four months of the children's removal. This was particularly concerning given Mother's admission that her mother's home had not been a good place for the children to be. Although parenting education was provided to Mother through Ms. Oakley both before and after the children's removal, Ms. Oakley testified that Mother did not appear to be motivated to make changes. Moreover, although Mother eventually moved out of her mother's home and into a separate apartment in November 2014, she shared this apartment with her longtime boyfriend with whom she had a history of domestic violence. This is significant inasmuch as a suitable home requires more than a physical space. *See In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002). Despite being required to participate in counseling to address this history of domestic violence with her boyfriend, Mother failed to seek out counseling for over a year after the children's removal. Even when she did belatedly seek out counseling, her attendance record failed to evidence a commitment to achieving emotional stability. Indeed, one of Mother's medical records from September 2015 reflects that she was in danger of being removed from the caseload if she missed a future appointment. In light of these considerations, we agree that there is clear and convincing evidence in the record to support the trial court's determination that Mother abandoned the children by failing to establish a suitable home.

*Substantial Noncompliance with the Requirements of the Permanency Plans*

Pursuant to Tennessee Code Annotated section 36-1-113(g)(2), a court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). In conjunction with terminating a parent's parental rights under this ground, the court "must

first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014) (citations omitted). "The trial court must then find that the noncompliance is substantial." *Id.* (citation omitted). Although the termination statute does not define what conduct constitutes substantial noncompliance, terminating parental rights under this ground "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d at 656. The significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *Id.* at 549. Because determining whether substantial noncompliance exists is a question of law, we review the issue de novo with no presumption of correctness. *Id.* at 548.

As previously noted, the permanency plans created in this case required, *inter alia*, that Mother complete a mental health assessment and follow all treatment recommendations, submit to random drug tests and pill counts, provide documents showing proof of income, demonstrate the ability to be financially self-sufficient, obtain and maintain housing, and pay child support. The plans also required Mother to "[c]on[t]i[n]ue to participate in mental health counseling to address [her] current diagnosis and follow recomme[n]dations of the mental health provider to ensure emotional stab[ility]." In its final decree, the trial court found that the permanency plan requirements were "reasonably related to remedying the conditions that necessitate foster care" and that Mother had not substantially complied with them. Concerning Mother's noncompliance, the trial court specifically determined that Mother had failed to consistently attended mental health counseling, failed to provide documents showing her income, and failed to pay child support.

We do not disagree with the trial court's determination that the above requirements are reasonable and related to remedying the conditions that necessitated foster care; the requirements are appropriately related to ensuring that Mother is able to provide a safe environment for the children and are practically directed at promoting Mother's ability to provide sufficient emotional and financial care for them. Moreover, we do not disagree with the trial court's determination that Mother's failure to comply with the permanency plan's mental health, proof-of-income, and child support requirements amounts to substantial noncompliance with the permanency plan's statement of responsibilities. The latter two requirements, which were mandated to demonstrate that Mother could provide for the children financially, were not consistently met in this case. Concerning the proof-of-income requirement, Mother suggested that she was unable to provide proof of income through means such as a pay stub or W-2 because she had previously worked for an individual, as opposed to a public company. However, her testimony revealed that she obtained a letter

from her individual employer on one occasion and provided it to the Department. Nonetheless, despite repeated reminders from Ms. Shores that Mother needed to regularly provide proof of income, Mother did not provide any other documentation of her earnings, save for another time when she provided a handwritten statement reporting her receipt of food stamps and other benefits. In addition, although Mother paid some child support and claimed that she sent in "whatever spare money [she could] get ahold of," she admitted that she had not consistently paid the full amount required. At trial, a printout from the child support office indicated that Mother had paid some support, most of which was paid in the four months preceding the filing of the termination petition. However, this printout noted that Mother had paid *no* support between the filing of the petition and November 2015.[10] The printout also evidenced the sizeable child support arrearage that Mother had accumulated.

Mother's biggest failure, however, was her failure to appropriately address her mental health needs. The trial court found that the mental health requirements in the permanency plans were "particularly important," and there is no question about this fact. Mother has an extensive history of mental health issues. Her medical records reveal that she has received a number of diagnoses over the years, ranging from mood disorder to OCD. This history has fueled a concern, not unjustifiably, that Mother's mental health struggles negatively affect her ability to appropriately care for the children. Indeed, we note that when a Department case manager met with Mother in February 2014 after receiving a referral that the children were unsupervised, Mother reported that she suffered from anxiety and depression.

---

[10] We previously noted that there was a lack of clear and convincing evidence that Mother's support to the children in the four months preceding the filing of the termination petition was mere token support. We reached this conclusion given the general absence of evidence pertaining to Mother's means during this period. *See in re Noah B.B.*, No. E2014-01676-COA-R3-PT, 2015 WL 1186018, at *8 (Tenn. Ct. App. Mar. 12, 2015) (citing *In re Z.J.S.*, 2003 WL 21266854, at *11) ("A finding that support was 'insignificant' in light of the parent's 'means' must be based on evidence regarding both the parent's actual financial support of his or her child and the parent's 'means.'"). However, we cannot excuse Mother's failure to pay any support following the filing of the petition. Although her testimony was somewhat paradoxical given her representation that she was pursuing disability benefits, Mother asserted that she was physically able to work. Indeed, despite her application for disability benefits on three occasions, Mother admitted that there had been no determination that she was disabled. Moreover, the trial court concluded that Mother was "able bodied" based on the evidence presented. Although Mother testified that the child support court had told her that her support obligation would be frozen until she received a disability determination if she provided a statement from her lawyer, Mother never stated whether she provided this statement or if her support obligation was actually frozen. It is also unclear when this purported dialogue between Mother and the child support court took place. The child support printout sheet introduced at trial indicated that Mother continued to accrue arrearages as late as November 2015.

In this case, Mother's need to submit to mental health treatment was so important that it was addressed in more than one section of both permanency plans. First, Mother's mental health needs were addressed in response to the Department's concern that she could not appropriately supervise and parent the children. After stating that Mother's ability to provide appropriate care was a "Desired Outcome," both permanency plans mandated that Mother complete a mental health assessment with a parenting component and follow all treatment recommendations. In addition, the permanency plans addressed Mother's mental health needs in response to the reported history of domestic violence between Mother and Doug M., her longtime boyfriend. After stating that Mother's ability to communicate effectively with Doug M. was a "Desired Outcome," both permanency plans mandated that Mother "[c]on[t]i[n]ue to participate in mental health counseling to address [her] current diagnosis and follow recomme[n]dations of the mental health provider to ensure emotional stab[ility]."

When Mother presented to Mr. Herman for a psychological evaluation and parenting assessment in October 2014, she stated that she had previously been diagnosed with borderline personality disorder. Although Mr. Herman could not definitively diagnose Mother as having borderline personality disorder following his evaluation of her, he stated that this possibility would be "best considered within the context of the therapeutic relationship." He noted that a diagnosis of borderline personality disorder was often accompanied by poor parenting due to the parent's unstable emotions. While Mr. Herman testified that he had previously worked with individuals who were successful parents notwithstanding the diagnosis of borderline personality disorder, he indicated that attaining such results required motivation and a commitment to treatment.

Although Mother acknowledges that she was required to participate in counseling, the medical records introduced at trial reveal that Mother did not begin counseling sessions until the few months leading up to trial.[11] Indeed, whereas Mother's mental health records indicate that she received case management services and attended medication management appointments somewhat frequently following the children's removal, there is no record of her attending counseling until the summer of 2015. Although Mother argues that her previous lack of attendance was the result of scheduling errors made by her former mental health provider, no proof in the record substantiates Mother's position on this issue outside of her own testimony. Again, while there is evidence that Mother made some efforts to participate in counseling prior to trial, the medical records reflect that these efforts only resulted in

---

[11] We do not intend to suggest that Mother did not participate in *any* counseling before this time. In fact, her medical records chronicle an extensive history of mental health treatment, including counseling, over several years predating the children's removal from her care. We are simply noting that, with respect to the time period after the creation of the first permanency plan, Mother's medical records do not evidence a participation in counseling until the summer of 2015.

Mother attending seven counseling sessions in total, all of which occurred in the months immediately preceding the termination hearing. The records do not confirm *any* participation in counseling between the children's removal and June/July 2015.[12] Mother's belated efforts at counseling attendance do not evidence a long-term commitment to resolve her issues and do not reflect a significant attempt to address the ongoing mental health issues that she claims exist. Although Mother testified at trial that she had attended more therapy sessions than the seven sessions that were chronicled, she admitted that such limited attendance *would* constitute a failure on her part to address her mental health needs.

Based on the foregoing, we conclude that the Department demonstrated by clear and convincing evidence that Mother was in substantial noncompliance with the permanency plans' statement of responsibilities. As we have already noted, Mother's need for therapeutic counseling was particularly important in this case given the suspected correlation between her mental health struggles, emotional instability, and inability to provide appropriate care for the children. Unfortunately, the medical records reflect that Mother left her need for counseling unaddressed for over a year after the first permanency plan was created.

*Persistence of Conditions*

Tennessee Code Annotated section 36-1-113(g)(3) outlines the ground for termination commonly known as "persistence of conditions." It applies where the following elements are present:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

---

[12] Although the medical records indicate that Mother presented to Pagean Goad, her counselor at the time of trial, on June 3, 2015, her visit on that date consisted of psychological intake. The records reflect that Mother's first therapy session with this counselor occurred on July 9, 2015.

Tenn. Code Ann. § 36-1-113(g)(3). "A finding on the ground of persistence of conditions is not appropriate unless DCS presents clear and convincing evidence to establish each statutory element." *In re B.A.C.*, 317 S.W.3d 718, 725 (Tenn. Ct. App. 2009) (citation omitted). The purpose behind this ground "is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008).

In its termination decree, the trial court concluded that the Department had successfully proven the persistence of conditions ground to support the termination of Mother's parental rights. In relevant part, it found as follows:

> 36. The conditions that led to the removal of the children from the home of [Mother] are mother's neglect of the children leading to Madison walking on the road without supervision.

> 37. The conditions that prevent the children's return to the parents' home are mother's failure to address her mental health conditions which contributed to the neglect.

Although the record shows that the children were removed from Mother's home for a period of more than six months on the basis of a court order, the other elements of Tennessee Code Annotated section 36-1-113(g)(3) were not established by clear and convincing evidence. There is no question that Mother's extensive history of mental health issues has generated much concern over her ability to parent the children, and as we have already noted, the record reflects that Mother was substantially noncompliant in attending the counseling required of her following the removal of the children. With that said, even in spite of Mother's admission that her mental health issues still generally persist and that she will "never be through with therapy," the record does not clearly show the impact that Mother's current mental health has on her ability to parent. Indeed, partially due to the fact that there are but a few sparse records evidencing a belated attempt at counseling, there is a lack of clarity surrounding the nature of Mother's mental stability at the time of trial. No witnesses offered significant testimony connected to this issue, much less demonstrated what bearing it had on returning the children to Mother's care. While expert testimony was not required to demonstrate that Mother's mental health was a persistent condition that prevented the children's return, *see In re Tiphani H.*, No. E2010-02112-COA-R3-PT, 2011 WL 4597551, at *8 (Tenn. Ct. App. Oct. 6, 2011), the evidence must still clearly and convincingly establish the presence of a condition that threatens the continuation of the parent-child relationship. Here, despite the clear evidence that Mother continues to require mental health counseling, it is unclear to us what danger her mental health directly poses to her parenting of the children.

Although medical progress notes and witness accounts might supply the requisite evidence on this issue in other cases, *see id.*, there is an absence of such evidence in the record transmitted to us on appeal. While we might suppose that Mother's failure to seek counseling as required suggests that her mental health still threatens her suitability as a parent, not every parent with mental health issues is unable to be a successful parent. Moreover, Mr. Herman's testimony illustrated that it often takes multiple counseling sessions to reach a proper diagnosis, and there was some indication at the time of trial that Mother's mental health diagnosis was in question. Due to the absence of specific testimony illustrating the nature of Mother's mental stability at trial and its relation to her ability to parent, we must reverse the trial court's finding that persistent conditions exist with respect to Mother. Although Mother's mental health may pose a significant barrier to reunification given her prior struggles and failure to seek consistent treatment, clear and convincing evidence on this point is lacking.[13]

*Severe Child Abuse*

A parent's parental rights may also be terminated when:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian.

Tenn. Code Ann. § 36-1-113(g)(4). In this case, the Department proceeded on this ground based on the prior finding that Mother committed severe child abuse against Madison. At trial, it introduced the juvenile court's April 24, 2015 "Adjudicatory and Dispositional Hearing Order" that was entered as a part of the dependency and neglect proceedings. In addition to concluding that the minor children were dependent and neglected, the juvenile court's April 24 order found that Mother had committed severe child abuse against Madison consistent with the definition of severe child abuse contained in Tennessee Code Annotated section 37-1-102(b)(21). Because Madison is a subject of the termination petition and is a

---

[13] Although Ms. Shores testified that Mother's counselor had informed her that Mother would have to be in therapy "for a good amount of time to be able to see any progress," the reported status of Mother's mental health does nothing to connect Mother's apparent lack of progress to an inability to parent. The testimony just vaguely reflects that Mother still has mental health problems. Indeed, this counselor's supposed report, *as relayed by Ms. Shores' testimony*, does not reflect the specific nature of Mother's mental health struggles and how they might impact her ability to care for and supervise the children.

half-sibling of the other two minor children at issue, once the juvenile court's April 24 order became final, a sufficient ground to terminate Mother's rights under Tennessee Code Annotated section 36-1-113(g)(4) existed. *See In re J.C.H.*, No. W2012-01287-COA-R3-PT, 2012 WL 6466631, at *10 (Tenn. Ct. App. Dec. 14, 2012) (noting that the issue of whether abuse occurred need not be re-litigated at the termination hearing once the finding of severe child abuse from the dependency and neglect proceedings becomes final). It is undisputed that Mother never appealed the prior finding that she committed severe child abuse. Accordingly, we affirm the trial court's decision to terminate Mother's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(4).

*Best Interests*

Despite our conclusion that statutory grounds for termination exist, such proof does not by itself justify the termination of a parent's parental rights. "Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013) (citation omitted), *perm. app. denied* (Tenn. Mar. 5, 2014). As such, "[w]hen at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *Id.* at 572 (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)).

When conducting a best interests analysis, conflicts between the interests of the parent and child are to be resolved in "favor of the rights and best interest of the child." *Id.* at 573 (citing Tenn. Code Ann. § 36-1-101(d)). Importantly, the best interests analysis "must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (citations omitted). In Tennessee, the Legislature has codified a list of nine, non-exclusive factors that trial courts are to consider when conducting a best interests inquiry in termination of parental rights proceedings. These factors are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "Ascertaining a child's best interests does not call for a rote examination" of these factors, and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *Moody*, 171 S.W.3d at 194).

In support of its determination that terminating Mother's parental rights was in the children's best interests, the trial court made several findings of fact. In pertinent part, the trial court found as follows:

2. [Mother] has failed to effect a lasting adjustment after reasonable efforts by available social agencies for such duration of time that lasting adjustment does not reasonably appear possible. The Department has made counseling

- 27 -

available to the parent but she has failed to adequately attend this counseling. Tenn. Code Ann. § 36-1-113(i)(2) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the children.

* * * *

4.  A meaningful relationship has not otherwise been established between the children . . . and [Mother].  Tenn. Code Ann. § 36-1-113(i)(4) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the children.

5.  A change of caretaker and physical environment is likely to have a negative effect on the children's emotional, psychological and/or medical condition. The foster parents have provided a structured environment so the children can thrive.  They will regress if returned to the neglectful home of the parents. Tenn. Code Ann. § 36-1-113(i)(5) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the children.

6.   [Mother] committed neglect toward other children in the family or household.  [Mother] was found to have committed severe child abuse[.] . . . Tenn. Code Ann. § 36-1-113(i)(6) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the children.

7.  [Mother's] mental and/or emotional status would be detrimental to the children and/or prevent her from effectively providing safe and stable care and supervision for the children.  Tenn. Code Ann. § 36-1-113(i)(8) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the children.

8.  [Mother] . . . ha[s] not paid child support consistently with the child support guidelines promulgated by the Department pursuant to Tenn. Code Ann. § 36-5-101.  T.C.A. 36-1-113(i)(9) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the children.

9.  The Court is not limited to considering the factors set out in Tenn. Code Ann. §§ 36-1-113(i) . . . and should consider the following factors as well in

determining whether termination of parental rights is in the best interest of the child.

10. [Mother] has not paid a reasonable portion of the children's substitute physical care and maintenance when financially able to do so. [Mother] works as an in-home sitter for elderly clients.

11. [Mother] . . . ha[s] shown little or no interest in the welfare of the children.

* * * *

13. The children are placed in a foster home that wishes to adopt the children.

14. The children have established a strong bond with the foster parents.

* * * *

16. The children need to be released from the stigma of being foster children.

Having reviewed the record transmitted to us on appeal, we agree with the trial court's determination that the Department has proven by clear and convincing evidence that termination of Mother's parental rights is in the best interests of the minor children. Despite her history of mental health issues and recognized need for counseling, Mother's medical records evidence a lack of participation in counseling for over a year after the children were removed. Although the record might not clearly and convincingly show that her current mental health poses a threat to the children by itself, a significant concern nonetheless exists as to whether Mother is committed to gaining and maintaining mental stability. Indeed, even Mother admitted that the seven counseling sessions her records show she attended were not sufficient to address her mental health needs. Moreover, even after she belatedly sought counseling, she did not show up for a number of scheduled appointments. This is troubling inasmuch as one of Mother's medical records from September 2015 reflects that she was in danger of being removed from the caseload if she failed to show up for appointments in the future.

Significant concerns also surround Mother's ability to care for her children. Ms. Oakley, who provided Mother with approximately twenty-five hours of parenting instruction, testified that she "never really saw any consistency" from Mother. She expressed concern that Mother was not motivated to make changes. Moreover, we note that the children's counselor, Mr. Clausi, described Mother as "inept." Although he did not believe that Mother was a bad person, he opined that she lacked the necessary skills to parent.

Although on appeal Mother argues that the Department failed to exercise reasonable efforts to assist her, the record reveals that the Department assisted Mother in a number of ways. At trial, the Department filed an affidavit outlining in detail its history of involvement with Mother, including the various meetings, phone calls, and home visits that had taken place with respect to the case. We note that the Department's efforts at reunification "need not be 'Herculean.'" *State, Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008). Indeed, "it is important to note that 'the remedial responsibility does not rest solely on the Department's shoulders.'" *Id.* (quoting *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004) (citing *In re R.C.V.*, No. W2001-0212-COA-R3-JV, 2002 WL 31730899, at *12 (Tenn. Ct. App. Nov. 18, 2002))). In this case, there is more than one example of how Mother's actions frustrated the Department's efforts in providing services and assistance. First, we note that while there is evidence that a communication barrier did exist between Mother and Ms. Shores, the record shows that Mother is to blame. Indeed, consistent with Ms. Shores' testimony that Mother was difficult to reach due to frequent changes in her phone number, the trial court found that Mother failed to stay in proper contact with the Department. Moreover, Ms. Shores testified that on some occasions when she had scheduled home appointments with Mother, Mother would be absent from her apartment. In addition to the general communication barriers that existed, the Department's ability to work with Mother was hindered due to the fact that Mother had previously made threats against Ms. Shores. Nonetheless, Ms. Shores testified that she encouraged Mother to attend her mental health therapy on the occasions when she was able to reach her.

Although Mother eventually moved into a residence separate from her mother's home following the children's removal, she shared this apartment with her longtime boyfriend with whom she had a history of domestic violence. Mother did not testify specifically about what this history of domestic violence included, but one of the Department's case records reports that Mother's boyfriend had hit her in the head with a baseball bat. While the permanency plans required Mother to attend counseling to help address the history of domestic violence that existed between her and her boyfriend, we have already noted how Mother was less than persistent in pursuing therapy.

The record of this case also reveals that Mother's previous neglect of Madison resulted in a severe impairment to Madison's functioning. Although there is evidence that Madison's overall status has improved since coming into the care of her foster parents, the juvenile court previously found in the dependency and neglect litigation that Mother's neglect of Madison constituted severe child abuse. Mother never appealed that ruling.

In clear contrast to the multitude of concerns that exist with respect to Mother, the evidence at trial showed that the children were doing well with the foster family. Mr. Clausi

attributed Madison's improvement to the structure and discipline that the foster parents provided, and Ms. Hensley opined that the children would regress if they were taken away from this support. According to Ms. Hensley, the children were "always smiling" in their foster home, and she supported the foster family as a permanent adoptive home for the children. Foster Mother testified that she was committed to adopting the children and noted that they had already meshed well with her two biological children. In light of this and other evidence presented to us in the record on appeal, we conclude that there is clear and convincing evidence to support the trial court's determination that terminating Mother's parental rights is in the children's best interests.

## CONCLUSION

For the reasons discussed herein, we vacate that portion of the trial court's final decree terminating Semaj L.'s parental rights. Concerning Mother's parental rights, we reverse that portion of the trial court's decree terminating Mother's parental rights on the ground of abandonment by willful failure to support and also on the ground of persistent conditions. We otherwise affirm the trial court's order terminating Mother's parental rights. Three[14] other grounds for termination were established by the Department by clear and convincing evidence, and there is clear and convincing evidence that the children's best interests would be served by termination of Mother's parental rights. The costs of this appeal are assessed against the Appellant, Sherry K. Because Sherry K. is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary. We hereby remand this case for the collection of costs, enforcement of the judgment, and for such further proceedings as may be necessary and are consistent with this Opinion.

_____
ARNOLD B. GOLDIN, JUDGE

---

[14] The statutory definition of abandonment "contains several distinct grounds." *In re Jayden B.T.*, No. E2014-00715-COA-R3-PT, 2015 WL 3876573, at \*9 (Tenn. Ct. App. June 23, 2015) (citations omitted), *perm. app. denied* (Tenn. Sept. 25, 2015). Although the evidence did not clearly and convincingly establish one definition of abandonment, it did sufficiently establish Mother's abandonment by failing to establish a suitable home.